## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **23-cr-328 (RJL)** |
| | : | |
| **JORDAN ALEXANDER** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

On February 13, 2024, Mr. Jordan Alexander entered a plea of guilty to unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  He will appear before this Honorable Court for sentencing on May 7, 2024.  The underlying conduct occurred on August 9, 2023, and Mr. Alexander was originally charged in Superior Court for the District of Columbia. Then, the government brought the case to Federal Court and he was arraigned on the charge on September 22, 2023.  Soon thereafter he indicated a desire to plead guilty and accept responsibility for his actions. Mr. Alexander respectfully requests that the Court sentence him, based on the sentencing factors set forth in 18 U.S.C. § 3553(a), to a term of not more than 24 months.

### FACTUAL BACKGROUND

Mr. Alexander is only 21 years old. He has lived in the Washington, D.C. metropolitan area his entire life.  He is single and has no children. Mr. Alexander was raised by his mother, a maternal grandmother, and a maternal uncle. His father was not involved in his life. He met his father when he was 10 years old and that encounter was not a positive one. (See PSR Para. 53). Despite the support he had from his mother's family, Mr. Alexander grew up in areas of Washington, D.C. that were rife with drugs, guns, and violence.  As a young person, Mr. Alexander made the common, yet poor, decision to give into his surroundings and associated

with individuals who were breaking the law, and he started to get in trouble himself at a young age. As the PSR notes, he has been involved in a number of incidents involving weapons and stolen cars. He seems to finally grasp that is important at this stage in his life that he begin to make better choices or he will end up serving a lengthy prison sentence or,  like so many of his friends, dead from violence. He has already been the victim of gun violence. (See PSR Para. 61).

While he does not make excuses for his behavior, it is important to note that he does have significant mental health concerns that appear to have gone unaddressed. (See PSR Para. 64) Presently, Mr. Alexander is focused on setting himself up for success upon his release.  During his period of incarceration, Mr. Alexander has been actively enrolled in education classes, pursuing his GED. He is also entitled to educational benefits arising out of the failure of the DOC to provide appropriate education for young men like himself and seeks to avail himself of those resources upon his release. Mr. Alexander is excited about the plans he has made. He hopes to leave the D.C. area upon his release from custody to avoid the negative environment. In the event that he remains in D.C., he is interested in being referred to the Court's Reentry Program to get the support to ensure that he succeeds in his efforts.  (See Exhibit 1, Letter from Mr. Alexander and documentation of his educational efforts.) It is also important to note, as the PSR documents, he has had no disciplinary infractions while in custody.

## I.  LEGAL STANDARD

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct, along with the kinds of sentences available; and (5) the

need to avoid unwarranted disparities.  *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543

U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of
> imprisonment, and, if a term of imprisonment is to be imposed, in
> determining the length of the term, shall consider the factors set
> forth in Section 3553(a) to the extent that they are applicable,
> *recognizing that imprisonment is not an appropriate means of
> promoting correction and rehabilitation.*

*See* 18 U.S.C. § 3582 (emphasis added).  With that limitation and considering all of the purposes

of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than

necessary*, to comply with the purposes [of sentencing]."  18 U.S.C. § 3553(a) (emphasis added).

When sentencing a defendant, the Court "may not presume that the Guidelines range is

reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Rather, the Court must treat the

Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.

*Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the

sentence that the Guidelines recommend, the Court must then "make an individualized

assessment," considering the remaining factors set forth in § 3553(a).  *Gall*, 552 U.S. at 50.

Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . .

sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to

tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case

before it.  *Rita v. United States*, 551 U.S. 338, 348, 350 (2007).  Consequently, this Court must

"filter the Guidelines' general advice through § 3553(a)'s list of factors."  *Id.* at 358; *see also*

*Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every case as a unique

study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

## II.  ARGUMENT

### A.  Sentencing Guidelines Calculation.

Mr. Alexander objects to the Guidelines calculation set forth in the Final Presentence Investigation Report ("PSR"). Mr. Alexander had no objections to the draft report, which specifically declined to include an enhancement under 3C1.2. However, Probation in the final report applied a two-level enhancement under this section. Mr. Alexander objects. It appears that this change was made after consultation with the government or receipt of objections from the government that were not shared with undersigned counsel.  Mr. Alexander submits that at most the offense level is 17 and his Criminal History Category is III.  The advisory Guidelines range, therefore, is, as Probation originally proposed, 30 to 37 months incarceration.

The Court should not apply the two-level enhancement for recklessly creating a substantial risk of death in the course during flight from law enforcement.  To apply this enhancement the government would have to prove that Mr. Alexander created a substantial risk of death or serious bodily injury *to another person* (not another person involved in the offense). As Probation first noted in the draft PSR, this enhancement should not apply in this case. Judge Kelly recently declined to apply this enhancement in a case with a similar fact pattern, *United States v. Jonathan Brown*, 22-cr-114 (TJK).

### B.  Section 3553(a) Factors.

#### 1.  History and Characteristics of Mr. Alexander.

Like the other sentencing factors under 18 U.S.C. § 3553(a), Mr. Alexander's history and characteristics support a variance to a sentence of 24 months. Mr. Alexander is very young and

has been taking significant steps towards his rehabilitation during his incarceration. He is dedicated to moving forward with his life, becoming educated and employed, with no further contact with the criminal justice system.

A downward variance is appropriate given Mr. Alexander's age at the time of the offense. He is only 21 years old now and was just 20 at the time of this offense. His youth and immaturity at the time of the offense bears on his culpability because "there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average."[1] Studies on brain development in adolescents by the National Institutes of Health show that the prefrontal cortex, the "executive" part of the brain important for controlling reason, organization, planning, and impulse control, does not fully mature until the early twenties.[2] The same National Institutes of Health study showed that the region of the brain that inhibits risky behavior is not fully formed until age 25.[3]

Because the prefrontal cortex is still developing, teenagers and young adults often rely on a region of the brain called the limbic system to make decisions and solve problems. The limbic system is associated with emotions, impulses, aggression, and instinctive behavior—trademark characteristics of young people's interactions with their surroundings.[4] In determining an adequate sentence, this Court should take into account the understanding among experts that the

---

[1] U.S. Sent'g Comm'n, Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015 (2017), https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2017/20170525_youthful-offenders.pdf.

[2] Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 Annals N.Y. Acad. Science 105–09 (June 2004).

[3] Elizabeth Williamson, *Brain Immaturity Could Explain Teen Crash Rate*, WASHINGTON POST, Feb. 1, 2005, at A01.

[4] Mariam Arain et al., *Maturation of the Adolescent Brain*, Neuropathic Disease Treatment, NAT'L CENTER FOR BIOTECHNOLOGY INFORMATION AT U.S. NAT'L LIBRARY OF MEDICINE 9: 449–461, 451, 453–54 (2013).

brain of a 20 or 21-year old is different from that of the adults this Court more commonly sentences.

The Supreme Court has also recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted). The Court has concluded that, because of these qualities, juveniles "have diminished culpability and greater prospects for reform." *Id.*; *see also Roper v. Simmons*, 543 U.S. 551, 569–70 (2005).

Additionally, the Court should consider that Mr. Alexander's young age would make him eligible for a Youth Rehabilitation Act ("YRA") sentence had the government chosen to charge this firearm possession case in Superior Court, rather than federal court. In Superior Court, Mr. Alexander would be eligible for a YRA sentence, which recognizes that a person under 24 years old should be treated differently than a similarly-situated mature adult. *See* D.C. Code §§ 24-901, 24-903. By electing to charge this case in federal court, at 20 years old at the time of the offense, Mr. Alexander was denied any possibility of a YRA sentence. As a result, Mr. Alexander now has a federal felony conviction and is subject to all of the collateral consequences that accompany it.

The YRA recognizes the science described above, specifically the fact that brains are still developing in individuals under 25. Recently, the D.C. Council amended the YRA to account for that fact, including by raising the eligibility to 24 years of age. *See* D.C. Code § 24-901(6).

Crucially, the Amendment also expanded the pool of individuals eligible to have a youthful conviction set aside.  *See* D.C. Code § 24-906(e-1).  Under the original YRA scheme, youthful offenders had to be sentenced under the YRA to be eligible to have their conviction set aside in the future.  But now any individual who is YRA-eligible—whether or not they are YRA-sentenced—may file a motion to set aside their conviction.  *See* D.C. Code § 24-901(e-1).

Thus, even if Mr. Alexander were not to be sentenced under the YRA, if the case remained in Superior Court, he could have petitioned the Court at a later date to have his conviction set aside.  No such protection exists for him now.  The Court should consider Mr. Alexander's age and the fact that his prosecution in federal court made him ineligible for the benefit of a YRA sentence and vary downward.

A downward variance is appropriate given Mr. Alexander's support system and commitment to changing his life upon release. While incarcerated, despite the extreme conditions of his confinement, Mr. Alexander has remained optimistic and dedicated to leading a lawful life in the future.  He is in constant contact with is family and has developed a plan to ensure his success upon his release. He has the support of his family to leave the D.C. area upon his release.  He has begun working towards his GED and hopes to attend college.

i.   **Relying on criminal history in sentencing is not justified by theories of punishment and has a racially disparate impact.**

Scholars recognize that "[i]t is difficult . . . to find a principled justification for increasing the severity of punishment because of an individual's criminal history" and that "criminal history is entangled with racial bias and foreseeable disparate racial effects."  Michael Tonry, *Predictions of Dangerousness in Sentencing: Déjà Vu All Over Again*, 48 Crime & Justice 439, 461 (2019).

Consequently, the *Model Penal Code: Sentencing* warns against the use of criminal

7

history in sentencing.  It cautions against using criminal history "for purposes of assessing offenders' blameworthiness for their current offenses" because "offenders have already been punished for their prior convictions."  American Law Institute, *Model Penal Code: Sentencing*, Proposed Final Draft § 6B.07(1) (Apr. 10, 2017), available at https://robinainstitute.umn.edu/ sites/robinainstitute.umn.edu/files/2022-02/mpcs_proposed_final_draft.pdf.  It cautions against using criminal history "for purposes of assessing an offender's risk of reoffending" because "the use of criminal history by itself may over-predict those risks."  *Id*.  Moreover, it cautions against using criminal history because of "the danger that the use of criminal-history provisions to increase the severity of sentences may have disparate impacts on racial or ethnic minorities, or other disadvantaged groups."  *Id*.  With respect to the last, the commentary explains, "[a]n accumulating body of research indicates that criminal-history formulas in sentencing guidelines are responsible for much of the 'unexplained' disparities in black and white incarceration rates— that is, disparities cannot be 'accounted for' by differential rates of crime commission, arrest, and conviction."  *Id*. § 6B.07 cmt. c(3).

"Racial differences in criminal history are a primary cause of racial disparities in imprisonment."  Tonry, 48 Crime & Justice 439, 458.  Studies have shown that "criminal history factors disproportionately affect blacks" because they are "arrested at younger ages and more often than white people for reasons that have as much to do with racially differentiated exercises of police discretion as with racial differences in offending behavior."  *Id*. at 462-63.  Police practices, including racial profiling and police targeting of poor and minority neighborhoods and individuals, inflate the criminal records of minority individuals compared with other people.  *Id*. In addition, "[b]lacks are much more likely than whites to be mislabeled as dangerous and, if this is reflected in sentencing, to be punished more severely than they otherwise would be."  *Id*. at

458; *see also* Michael Tonry, *Fifty Years of American Sentencing Reform: Nine Lessons*, 48 Crime & Justice 1, 15 (2019).

Lastly, "it is imperative that the sentencing system do nothing to exacerbate preexisting racial disparities arising from life conditions in segregated and disadvantaged communities, or disparities introduced in earlier stages of the criminal justice process." American Law Institute, *Model Penal Code: Sentencing*, Proposed Final Draft § 6B.07 cmt. c(3). Here, it is clear that a Guidelines sentence would do just that.

### ii. A lengthy sentence serves no greater purpose of sentencing.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").

In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016). This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce

recidivism more than shorter sentences."  Austin, Brennan Ctr., *supra*, at 35.  Some studies have

concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher

recidivism.  *Id*.  Similarly, a 2002 Justice Department study "found that recidivism rates did not

differ significantly among those released after serving 6 months or less compared to those

serving sentences all the way up to 30 months in prison."  *Id*. at 36.

With respect to general deterrence, studies also "indicate that long prison sentences have

little or no impact on reducing the criminal behavior of the public at large" because "most people

consider immediate circumstances and emotions instead of longer term legal consequences when

acting or reacting."  *Id*.  Significantly, a 1997 study in Richmond, Virginia "found no deterrent

effect associated" with a policy "that increased prison sentences for gun crimes by prosecuting

them as federal crimes."  *Id*. at 37.

Significantly, there is no empirical research supporting the assumption that progressively

tougher or punitive sanctions for repeat offenders are more effective than the same or lesser

sanctions.  Daniel P. Mears & Joshua C. Cochran, *Progressively Tougher Sanctioning &*

*Recidivism: Assessing the Effects of Different Types of Sanctions*, Journal of Research in Crime

& Delinquency 1, 34 (2017) ("Scholarship in deterrence does not uniformly anticipate that more

severe sanctions will provide a greater specific deterrent, and some research suggests that they

may worsen offending.").

With respect to sentencing disparities, Sentencing Commission research found that

"Black male offenders received sentences on average 19.1 percent longer than similarly situated

White male offenders," even accounting for any history of violence.  U.S. Sent'g Comm'n,

*Demographic Differences in Sentencing: An Update to the 2012* Booker *Report*, 2 (Nov. 2017).

The disparity was slightly greater for firearms offenses:  from approximately 2011 through 2016,

"Black male firearms offenders received sentences that were 19.3 percent longer than those for White male firearms offenders." *Id.* at 29. "Black male offenders were [21.2 percent] less likely than White male offenders to receive a non-government sponsored downward departure or variance during the most recent period studied." *Id.* at 15, 20. In addition, "even when Black male offenders received a non-government sponsored downward departure or variance, their sentences were longer than White male offenders who received a non-government sponsored departure or variance." *Id.* at 20.[5]

A below Guidelines sentence of incarceration would be sufficient, but not greater than necessary, to serve the purposes of sentencing. Mr. Alexander will also be subject to a term of supervised release following his incarceration. A term of supervised release is a "'substantial restriction of freedom.'" *Gall*, 552 U.S. at 48 (citation omitted).

### iii. A sentence of 24 months in addition to the collateral consequences Mr. Alexander will experience will reflect the basic aims of sentencing.

In addition to a period of incarceration Mr. Alexander will experience collateral consequences for his crime. He has been convicted of a felony offense and with that comes myriad life-long consequences. *See United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) (holding that a court may properly consider the host of collateral consequences that attend a felony conviction, including loss of benefits and difficulty finding future employment, when fashioning a sentence). This conviction will hinder his ability to obtain high-paying employment open to people with or without a college degree. It may also impact his ability to vote in certain states. These are significant consequences that the Court can consider in determining a "just

---

[5] When Black males received a government-sponsored below-guideline sentence for reasons other than substantial assistance, their sentences were 28.7 percent longer than White males who received such a sentence. *Id.* at 12, fig. 8.

punishment" for Mr. Alexander.

### iv.  A below guidelines sentence will not create unwarranted sentencing disparities.

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing."  U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Over recent years, courts have been increasingly imposing non-government sponsored below guideline sentences in firearm cases.  *See* Quick Facts, Felon in Possession of a Firearm https://www.ussc.gov/research/quick-facts/section-922g-firearms.  In 2022, courts imposed non-government sponsored below guideline sentences in nearly 35 percent of these cases.  *Id*.  Of those offenders who received a non-government sponsored below guideline sentence, the average reduction was approximately 36%.  *Id*.

A review of recent sentences demonstrates that a below Guidelines sentence is not abnormal.

- *United States v. Malik Wilkins*, 19- cr-245 (TFH) (defendant had criminal history and committed instant offense while on supervision). Lastly, this Court imposed a below-guidelines sentence where the defendant was arrested for gun possession and multiple guns and ammunition were recovered from the defendant's home and where the

defendant had a prior conviction for first-degree murder for which he had served 15 years.

- *United States v. Williams*, 1:20-cr-37 (DLF) (30 months imposed though applicable guideline range was 41 to 51 months).

  - *United States v. Marcus Mahone*, No. 17-cr-236 (ABJ) (Mr. Mahone's applicable Guidelines range in the plea agreement was 46-57 months and the Court sentenced him to 24 months).

  - *United States v. Juamal Carroll*, No. 19-cr-407 (ABJ) (Mr. Carroll's applicable Guidelines range in the plea agreement was 30-37 months and the Court sentenced him to 18 months incarceration concurrent with a Maryland supervised release violation).

  - *United States v. Delonte Brown*, No. 20-cr-239-01 (ABJ) (Mr. Brown's applicable Guidelines range in the plea agreement was 37-46 months and the Court sentenced Mr. Brown to 21 months).

  - *United States v. Gregory Simpson*, No. 20-cr-261 (ABJ) (Mr. Simpson's applicable Guidelines range in the plea agreement was 30-37 months and the Court sentenced Mr. Simpson to 22 months).

  - *United States v. Simmons*¸19-cr-409 (KBJ), (Mr. Simmon's applicable guideline range in the plea agreement was 12 to 18 months and the Court varied downward and sentenced the defendant to time-served.)

  - *United States v. Christopher Carroll*, 20-cr-16 (JEB) (Mr. Carroll's guideline range was 30 to 37 months and the Court varied downward and sentenced the

defendant to one year and one day);

- *United States v. Antone Watkins*, 20-cr- 19 (CRC) (Mr. Watkins' guideline range was 30 to 37 months and Court varied to  1 4 months.

District judges have likewise varied downward in cases in which defendants had significant records. In *United States v. Norris*, 1:22-cr-00035-TFH, the defendant was on supervision for a manslaughter and was arrested with a firearm. The district court imposed a sentence of 18 months, notwithstanding a guideline range of 30 to 37 months. In *United States v. Javon Hensen*, 1:20CR138 (RBW) the defendant had four prior firearms offenses, resulting in a guideline range of 46 to 57 months. In that case, the government agreed to recommend 34 months and a sentence of 34 months was imposed.

Thus, a below guidelines sentence would not create unwarranted disparities.  As noted, below guidelines sentences are common in firearm cases.

### III.CONCLUSION

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Alexander respectfully requests that the Court impose a sentence of 24 months with a period of supervised release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500